The next matter, number 171794, Diana Del Grosso et al. v. Surface Transportation Board et al. This is the second time this matter has been in front of the panel. The court remanded this to the Surface Transportation Board a couple of years ago. The court's instructions on remand were that it is required to determine whether the vacuuming, screening, bagging, and palletizing at the wood pellet manufacturing facility in the Upton Yard facilitated the translating of the pellets from the rail cars to the trucks or was done solely for another unrelated purpose. This case involves a wood pellet manufacturing facility within the Grafton-Upton Rail Yard. My clients are the seven people who live closest to the facility, and it operates whenever it cares to operate. It makes noise and has been unregulated as a result of Section 10501B of the Surface Transportation Board's enabling legislation. The court said a couple of years ago the proper focus should have been on the question of whether the activities vacuuming, screening, bagging, and palletizing facilitated the physical movement of passengers or property rather than cost efficiency. I think all parties agree that the controlling STB precedent here is New England TransRail, and the court in fact cited New England TransRail in its original decision. Manufacturing and commercial transactions that occur on property own by a railroad that are not part of or integral to the provision of rail service are not embraced within the term transportation. So this case is really about six activities that take place in the yard. In order, as the hopper cars arrive loaded with wood pellets, the pellets are vacuumed, screened, repelletized. Repelletized is the pressing together of the broken pellets that have occurred, according to the railroad and the board, during the transportation phase, the bagging of the pellets, the palletizing of the bags, and the shrink wrapping of the bags. If you put to one side the repelletizing for a moment, and then take what was before this court previously, the vacuuming, the screening, the bagging, the palletizing, as opposed to the repelletizing. So we send it back to see, does it facilitate loading the pellets onto the trucks? New England TransRail says if it's transportation, if it permits the use of a wider variety of trucks, why don't those four processes there, by getting it into the bags on shrink-wrapped pellets, facilitate using flatbed trucks that otherwise wouldn't be able to be used? Well, we think that New England TransRail is being stood on its head. In that case, the solid waste was baled and wrapped, and it appeared in the rail yard, ready to be loaded onto trains. The board in New England TransRail said that that facilitates the use of many different types of rail cars. So this was stuff arriving, baled and wrapped, and leaving on different types of rail cars. Here, it's all coming in by hopper, and there is a point in the record where Mr. Polselli, who is the general manager of the facility, says some of the potential new customers will not be shipping, will be shipping the pellets out in bulk and will not require bagging. So some percentage of this is coming in by leaving a hopper truck. If it comes in in hoppers, right, so it's all the pellets poured en masse into a hopper, and there's testimony in the record that that actually results in a lower level of pellet degradation than if they bagged it prior. And then you want to get it onto flatbed trucks. How do you do that other than bagging it? We think that the outcome is self-predicting. If you have a pellet manufacturing facility which includes bagging in the yard, the trucks that arrive will be flatbed or boxed. But doing the transrail says if you do something that allows the use of a wider variety of trucks, flatbeds are a wider variety than just having non-flatbeds, trailers. So how could they get it onto the flatbed trucks without bagging it? They don't have to put it on flatbed trucks at all. They can take it off the facility in hopper trucks and then do the bagging, pelletizing, and shrink wrapping at another location. Let me ask you about the repelletizing, and what catches my attention on that, because that seems to be a closer issue, is the Supreme Court's ICC decision in 1911 in Southern Pacific. How do you distinguish that? We think that the repelletizing here is manufacturing in that it would result otherwise in the discarding of the broken pellets. So that constitutes added value to use one of the tests from the transrail. And we also think that the repelletizing cannot be distinguished, as the board and the railroad tried mightily to do, from the original manufacturing. But what about the grinding of the cotton seed cake in the Southern Pacific case, where, as I understand it, the Supreme Court held that that is transportation sufficient to invoke and maintain the jurisdiction of the ICC. So if grinding cotton seed cake down so it could then be transported in a different form, which would clearly add some value to it, is transportation. Why isn't it reasonable to say that pressing without any steam or added chemicals in a dye the broken pellets back together is materially different? I would just cite the dissenting member's opinion on this point. If it's spot repair, which she called it in the dissent, then where does it stop? Are we going to repair TVs, to use her example, or automobiles that also suffer some sort of damage during transit? Well, couldn't you say that about the cotton seed cake? It's an old case. I guess that's ultimately the question I ask is how far does this go? The estimate that the railroad provided was that 5 to 10 percent of the pellets were broken during rail transit. We won't allow discovery on two occasions, so I have no way to dispute that. What if it's 1 percent? Do I get to have a repelletizing factory in a yard in order to accommodate that kind of damage? So I think this is really the tail wagging the dog in a couple of respects. Number one, with regard to the operations of bagging, pelletizing, and shrink-wrapping, the outcome, as I said, is predicting itself. They bag it, so of course flatbeds are going to arrive, boxcars are going to arrive, but there's no reason why it can't leave the facility in a hopper truck as it arrived in a hopper car. The exemption here, as the dissenting member pointed out, is being used as a sword, not as a shield. Where does it stop? At some point... So I think, would you be saying that anything that comes in ungross, in unpackaged, unbarreled, whatever activity, any activity that allows that, that puts that in smaller containers than a hopper truck, so that it can then be used on other than hopper trucks, you would say that is not transportation? I think particularly with regard to... I'm prepared to argue that all of the six steps constitute manufacturing rather than transportation, but particularly with regard to the re-pelletizing, it is the use of the exemption 105.01b to do something in a rail yard that you wouldn't be able to do under a town zoning regulation, or at least you would have to do it in a restricted area, where proper controls would be put in place that would regulate hours of operation, noise, lights, traffic, parking, things of that sort. None of that occurs in the rail yard due to the preemption. With regard to the other... The STD also said that vacuuming, screening, and re-pelletizing are services  It restores lost value caused by the rail transportation. In this part of its decision, the board tries to distinguish original manufacturing, in which there's a shipment of raw materials to the pellet manufacturing facility, from this, which is simply the squeezing together of the broken pellets. We argue that that constitutes manufacturing, again, which is impermissible inside the yard. Let me ask you one other thing. There seems to be an argument, too, that a test, in effect, we're applying here, is whether the re-pelletizing is related to the movement of goods in transit. As I understand it, the board says, well, sure it is, because it is precisely the movement of the goods in transit that break down some of the pellets, hence requiring that they put back together again. So it is related to the movement in that sense. What is the response to that argument? In the first instance, we don't have any way to dispute the percentage, which is cited by the opposing parties here, which is 5 to 10 percent of the pellets are broken during the shipment in the rail car. I'll take that as a fact, if that's essentially agreed upon. But, again, tail wagging the dog. At what point does the amount of broken pellets dictate a facility of this type in a rail yard? Is 1 percent enough? Is 2 percent enough? Is 5 to 10 percent enough? Is 50 percent a more appropriate number? It's the same sort of extrapolation that's occurring with regard to the bagging operation. If 50 percent of the trucks that show up to take the pellets off the facility are hobble trucks, then that's a very different circumstance than 10 percent. Does the bagging add any value? I believe it does, rather. Apart from what you believe, is there anything in the record that shows it adds value? Well, it takes something which is unusable by the general public and puts it into a portable, scannable bag of 40 pounds that the consumer can take home. So I do believe that it adds value. Is there a difference between bagging and repelletizing? Yeah. That the latter can make a fairly good argument, and the latter adds a value to the pellets rather than bagging them? Without conceding my earlier point, I believe that it does make a more clear argument that there's value added. But I believe the bagging adds value as well. Thank you. Mr. Light, good morning. Good morning. Eric Light for the STB and the United States. With me at council table is Mr. Jim Howard for intervenor draft in the Mpton Railroad. Mr. Howard is available to answer any questions should the court have any for him. I'd like to make two points just to respond to a couple things that opposing counsel said. In talking about the Newland Transrail case, he suggested, if I heard him correctly, he suggested that municipal solid waste in that case arrived only pre-bailed. And that's not correct. The record shows that, in fact, it arrived in many forms. Some of it was pre-bailed, but some of it arrived in loose form. And what happened in that case was the rail carrier bailed some of the loose municipal solid waste and loaded it onto rail cars. And some of the loose municipal solid waste is simply loaded into containers and then loaded into rail cars without bailing and wrapping. And yet the board in that case found that bailing and wrapping was part of rail transportation. The second point I wanted to respond to was simply the claim that they were deprived of discovery. It is true that in the original proceedings the board did not allow discovery, but discovery was asked on the question of who was performing the activities at the rail yard. Was it the rail carrier itself or someone on behalf of the rail carrier or a third party? Petitioners never asked for discovery on the causation question in terms of whether this breakage is caused by the rail movement itself. And they never sought discovery on remand when that issue was raised for the first time. I'd like to make two basic points today. The first point is that the board properly applied the transloading test that this court directed it to apply in its prior decision to find that bagging, palletizing, and shrink-wrapping are part of transportation. And the second point arises out of the fact that on remand, petitioners raised a new argument. That is, they argued for the first time before the board that repalletizing is not part of rail transportation. And in response to that argument, GNU raised arguments that had nothing to do with transloading. And it was based on those arguments that the board found that vacuuming, screening, and repalletizing are related to transportation because they seek to fix problems caused by the rail movement itself. Can I ask you something? Sure. You could transport, you could not transport to trucks these pallets if you didn't bag them. Correct, Your Honor. Well, yes. It would be impossible to transport in a truck, almost. I think they could be transported in a tanker truck or a dump truck, for example, but they could not be transported on these types of trucks, which are flatbed trucks and trailer trucks. That reinforces your argument as part of the transportation. We believe that, yes. Let me just continue. Okay. If you didn't repalletize, would you attempt to transport what basically is material that you can't use otherwise? I don't know the record shows that the material would be unusable otherwise without repalletizing. I'm sorry, I have to say remanufacturing. I would not call it remanufacturing. I would. What I would say is that it is restoring the product to the original condition it was in when it left the factory in British Columbia or Georgia, which is where these pallets originate. The record shows that less than 1% of these pallets are broken when they leave the factory and that by the time they arrive at the Upton facility, 5 to 10% of them are broken. Can they be used? Can that material be used in the state they arrive broken? Does the record show they can be used? I think what the record shows is that the broken pallets and dust cause problems in the home heating systems. Now, whether or not they can be used, I'm not sure. I know it's not as good a product, certainly, if the vacuuming and screening and repalletizing are not done. Suppose they're shipping glass stemware, Waterford Crystal or something like that, and 5 to 10% of the glasses break in shipment. Are you saying that the railroad could erect a facility at the receiving end to melt down the glass, re-pour it into molds, re-etch it, and then put it on trucks? If you're not saying that, then how does this repalletizing differ? To be honest, I'm not sure how the board would rule in that type of a situation. I guess what I would say is, just practically speaking, I think if rail transportation causes such damage to a product that you have to basically re-manufacture it from the beginning, I don't think that rail carriers are going to be doing that. But if there is relatively small damage, as there is here, I think, yes, we might try and address that damage, because otherwise they're going to be responsible for the damage through loss and damage claims. What do you call small damage in this case? What does the record show? Normally they arrive in spherical shape? I don't know the record shows the exact shape. I'm talking about the pellets. I'm talking about the undamaged ones. How do they arrive? Yeah, I think they're pellets. Yeah, sphere. And what about the damaged ones? How do they arrive? Well, they're broken, and we don't know what shape they're in. Well, obviously they're not spheres anymore. So they're not usable for the purpose for which they were shipped at that point. Well, Your Honor, I don't know. If you put them in a home heating system, all I know is that it is not as good a product, and whether or not it actually works or doesn't work, I'm not sure the record shows that. The record says it could damage the home heating system. So I think we can assume what Judge Sterloff is saying is that you need to do something to them if you're going to send them on in the bags with the whole pellets. And I think that's another reason why it makes sense for the board to find if this is part of rail transportation, the repellent types that I'm talking about, because the railroad is simply repairing the damage that is indisputably caused by that rail transportation. And as for, I guess one other point I wanted to make with regards to vacuuming, screening, and repellentizing, we know that the statute goes beyond transloading activities because there's a non-exhaustive list of examples in the statute, some of which have nothing to do with transloading. For example, refrigeration, icing, ventilation, and storage. Those are sorts of activities which can be done during the rail journey and have nothing to do with transloading. And so it was appropriate for the board to go beyond the transloading test that this court articulated in the last decision. I'd just like to respond to one of the arguments that petitioners make that repellentizing is manufacturing because this is what the actual manufacturers do. In fact, the manufacturers don't repellentize. They don't repellentize certainly in the same sense that GNU does. What GNU does is they take two broken pellets or pieces of pellets, two or more, I guess, and press them back together. What the manufacturers do is they take dust, broken pellets, incompletely manufactured pellets, and they recycle that material back through the entire manufacturing process, which includes chipping the wood, drying it, pulverizing it, steaming it, drying it again. So it's a different process that the manufacturers go through. And it's done for a different reason. GNU performs repellentizing to repair damage that's caused by the movement itself, whereas the manufacturers are simply trying to create pellets in the first instance. Mr. Square, is there any other questions? We ask that the court deny the petition for review. Thank you. Thank you.